UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 16-CV-24483-SCOLA
        (11-CR-20331-SCOLA)
MAGISTRATE JUDGE P.A. WHITE

HAFIZ MUHAMMAD SHER
ALI KHAN,

    Movant,

                                       **REPORT OF**

v.                        **MAGISTRATE JUDGE**

UNITED STATES OF AMERICA,

    Respondent.

_____/

## I. Introduction

The movant, Hafiz Muhammad Sher Ali Khan, has filed this amended motion to vacate (Cv-DE#17), pursuant to 28 U.S.C. §2255, challenging the constitutionality of his convictions and sentences for providing material support to terrorists, in violation of 18 U.S.C. §2239, entered following a jury verdict in **case no. 11-CR-20331-SCOLA.**

This Cause has been referred to the Undersigned for consideration and report pursuant to 28 U.S.C. §636(b)(1)(B),©; S.D.Fla. Local Rule 1(f) governing Magistrate Judges, S.D. Fla. Admin. Order 2003-19; and, Rules 8 and 10 Governing Section 2255 Cases in the United States District Courts.

The Court has reviewed the movant's amended motion(Cv-DE#17) with supporting appendix (Cv-DE#18), the government's response (Cv-DE#25) to this court's order to show cause, the movant's reply to the government's response (Cv-DE#26), the Presentence Investigation

1

Report ("PSI"), Statement of Reasons ("SOR"), and all pertinent portions of the underlying criminal file under attack here, including the trial and sentencing transcripts.[1]

## II. Claims

In his §2255 motion, the movant essentially raises the following two grounds for relief:

    1.   He was denied effective assistance of counsel, where his lawyer failed to present material witnesses from Pakistan. (Cv-DE#17:4).

    2.   He was denied effective assistance of counsel, where his lawyer failed to prepare him to testify. (Cv-DE#17:4).[2]

## III. Procedural History

Briefly, movant was found guilty by a jury of conspiracy to provide material support to terrorists, conspiracy to provide material support to a designated foreign terrorist organization, material support to terrorists, and material support to a designated foreign terrorist organization, all in violation of 18 U.S.C. §2239.(Cr-DE#765).

Prior to sentencing, a PSI was prepared, which revealed that, the total base offense level was set at a level 33, pursuant to

---

[1]The undersigned takes judicial notice of its own records as contained on CM/ECF in those proceedings. See Fed.R.Evid. 201.

[2]Movant raises both of these claims under "Ground One" of his amended motion, however they have been separated by this court for purposes of this report.

U.S.S.G. §2X2.1. (PSI ¶23). A twelve-level victim related enhancement was given pursuant to §3A1.4(2), because the offense involved a federal crime of terrorism. (PSI ¶25). Movant was also given a two-level enhancement pursuant to §3B1.1(a) because he was an organizer of the criminal activity. (PSI ¶26). Finally, a two-level enhancement was given pursuant to §3C1.1, because the movant willfully obstructed the administration of justice. (PSI ¶27). Thus, the total adjusted offense level was set at 49. (PSI ¶28). The total offense level was then reduced to 43 pursuant to Application Note 2 under Chapter 5, Part A, which states that an offense level of more than 43 is to be treated as an offense level of 43. (PSI ¶31).

Next, the probation officer determined that the movant had a total of zero criminal history points. (PSI ¶34). Pursuant to §3A1.4(b), movant's criminal history category was determined to be VI. (PSI ¶34). Based on a total adjusted offense level of 43 and a criminal history category VI, the guideline imprisonment range was determined to be 720 months. (PSI ¶60).

Movant appeared for sentencing on August 23, 2013. (Cr-DE#861). After hearing from the government and the movant, the court then indicated it had considered the statements of the parties, the PSI, the advisory guidelines, and the statutory factors set forth in 18 U.S.C. §3553. (Id.:34). Thereafter, the court sentenced the movant to a total term of 25 years imprisonment, to be followed by five years of supervised release. (Id.:36).

Movant prosecuted a direct appeal, raising four grounds of trial court error for: (1) violating his right to present a full defense by refusing to give him additional time to secure the

testimony of material defense witnesses; (2) violating his right to present a full defense by curtailing his cross-examination of the lead case agent; (3) committing reversible error by allowing the lead case agent to testify as an expert on Pakistan without proper qualifications; and (4) denying him a meaningful opportunity to challenge the admissibility of FISA interceptions. United States v. Khan, 794 F.3d 1288 (11ᵗʰ Cir. 2015). On July 23, 2015, the Eleventh Circuit entered a written opinion affirming his conviction. Id.; (Cr-DE#880). Petitioner's motion for rehearing en banc was denied on October 21, 2015 and the mandate issued on October 29, 2015. (Cr-DE#880). No certiorari review appears to have been filed by the movant.

Thus, movant's judgment of conviction became final on **January 19, 2016,** when the 90-day period for seeking certiorari review with the U.S. Supreme Court expired.[3] The movant had one year from the time his judgment became final, or no later than **January 19, 2017,**[4] within which to timely file this federal habeas petition.

---

[3] The Supreme Court has stated that a conviction is final when a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied. Griffith v. Kentucky, 479 U.S. 314, 321, n.6 (1986); accord, United States v. Kaufman, 282 F.3d 1336 (11ᵗʰ Cir. 2002); Wainwright v. Sec'y Dep't of Corr's, 537 F.3d 1282, 1283 (11ᵗʰ Cir. 2007)(conviction final under AEDPA the day U.S. Supreme Court denies certiorari, and thus limitations period begins running the next day). Once a judgment is entered by a United States court of appeals, a petition for writ of certiorari must be filed within 90 days of the date of entry. The 90 day time period runs from the date of entry of the judgment rather than the issuance of a mandate. Sup.Ct.R. 13; see also, Close v. United States, 336 F.3d 1283 (11ᵗʰ Cir. 2003). Here, because movant filed a motion for rehearing, the 90 day time period runs from the date of the denial of the rehearing motion.

[4] See Downs v. McNeil, 520 F.3d 1311, 1318 (11th Cir. 2008)(citing Ferreira v. Sec'y, Dep't of Corr's, 494 F.3d 1286, 1289 n.1 (11th Cir. 2007)(this Court has suggested that the limitations period should be calculated according to the "anniversary method," under which the limitations period expires on the anniversary of the date it began to run); accord United States v. Hurst, 322 F.3d 1256, 1260-61 (10th Cir. 2003); United States v. Marcello, 212 F.3d 1005, 1008-09 (7th Cir. 2000)); see also, 28 U.S.C. §2255.

See <u>Insignares v. Fla. Dep't of Corr's</u>,[5] 755 F.3d 1273, 1280 (11th Cir. 2014). Applying the anniversary method to this case means movant's limitations period expired on **January 19, 2017.**

Absent evidence to the contrary, it appears the movant returned to this court filing his timely, initial §2255 motion on or about **October 20, 2016,** the date he signed his motion and then handed it to prison authorities for mailing in accordance with the mailbox rule.[6] (Cv-DE#1:12).

## IV. <u>Threshold Issues-Timeliness</u>

The government rightfully does not challenge the timeliness of the movant's amended motion to vacate since it relates back to the filing of his initial, timely motion to vacate, which was filed prior to the expiration of the federal one-year limitations period. <u>See</u> 28 U.S.C. §2255; (Cv-DE#25:2).

## V. <u>General Legal Principles</u>

Because collateral review is not a substitute for direct

---

[5]In <u>Insignares</u>, the Eleventh Circuit found that, for purposes of the AEDPA, "judgment" refers to the underlying conviction and the most recent sentence that authorizes a petitioner's current detention. <u>Id</u>. The court noted that a resentencing results in a new judgment that restarts the AEDPA's one-year statute of limitations period. <u>Id</u>. (<u>citing</u> <u>Ferreira</u>, at 1292-1293).

[6]"Under the prison mailbox rule, a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." <u>Williams v. McNeil</u>, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009); <u>see</u> <u>Fed.R.App.</u> 4(c)(1) ("If an inmate confined in an institution files a notice of appeal in either a civil or a criminal case, the notice is timely if it is deposited in the institution's internal mail system on or before the last day for filing."). Unless there is evidence to the contrary, like prison logs or other records, a prisoner's motion is deemed delivered to prison authorities on the day he signed it. <u>See</u> <u>Washington v. United States</u>, 243 F.3d 1299, 1301 (11th Cir. 2001); <u>Adams v. United States</u>, 173 F.3d 1339 (11th Cir. 1999) (prisoner's pleading is deemed filed when executed and delivered to prison authorities for mailing).

appeal, the grounds for collateral attack on final judgments pursuant to §2255 are extremely limited. A prisoner is entitled to relief under §2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. See 28 U.S.C. §2255(a); McKay v. United States, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011). "Relief under 28 U.S.C. §2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'" Lynn v. United States, 365 F.3d 1225, 1232 (11th Cir. 2004)(citations omitted). The "fundamental miscarriage of justice" exception recognized in Murray v. Carrier, 477 U.S. 478, 496 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent ...."

The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to the assistance of counsel during criminal proceedings against them. Strickland v. Washington, 466 U.S. 668, 684-85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When assessing counsel's performance under Strickland, the Court employs a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690. "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance ...." Burt v. Titlow, ___ U.S. ___, 134 S.Ct. 10, 18, 187 L.Ed.2d 348 (2013). To prevail on a claim of ineffective assistance of counsel, the movant must demonstrate (1) that his counsel's performance was deficient, i.e., the performance fell below an objective standard of

reasonableness, and (2) that he suffered prejudice as a result of that deficient performance. <u>Strickland</u>, 466 U.S. at 687-88.

To establish deficient performance, the movant must show that, in light of all the circumstances, counsel's performance was outside the wide range of professional competence. <u>Strickland</u>, <u>supra</u>. <u>See also</u> <u>Cummings v. Sec'y for Dep't of Corr's</u>, 588 F.3d 1331, 1356 (11th Cir. 2009)("To establish deficient performance, a defendant must show that his counsel's representation fell below an objective standard of reasonableness in light of prevailing professional norms at the time the representation took place.")(internal quotation marks omitted). The Court's review of counsel's performance should focus on "not what is possible or what is prudent or appropriate but only [on] what is constitutionally compelled." <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000)(<i>en banc</i>), <u>cert. den'd</u>, 531 U.S. 1204 (2001)(<u>quoting</u> <u>Burger v. Kemp</u>, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)).

Furthermore, a §2255 movant must provide factual support for his contentions regarding counsel's performance. <u>Smith v. White</u>, 815 F.2d 1401, 1406-07 (11th Cir.1987). Bare, conclusory allegations of ineffective assistance are insufficient to satisfy the <u>Strickland</u> test. <u>See</u> <u>Boyd v. Comm'r, Ala. Dep't of Corr's</u>, 697 F.3d 1320, 1333-34 (11th Cir. 2012); <u>Garcia v. United States</u>, 456 Fed.Appx. 804, 807 (11th Cir. 2012) (<u>citing</u> <u>Yeck v. Goodwin</u>, 985 F.2d 538, 542 (11th Cir. 1993)); <u>Wilson v. United States</u>, 962 F.2d 996, 998 (11th Cir. 1992); <u>Tejada v. Dugger</u>, 941 F.2d 1551, 1559 (11th Cir. 1991), <u>cert. den'd</u> <u>Tejada v. Singletary</u>, 502 U.S. 1105 (1992); <u>Stano v. Dugger</u>, 901 F.2d 898, 899 (11th Cir. 1990)(<u>citing</u> <u>Blackledge v. Allison</u>, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977)); <u>United States v. Ross</u>, 147 Fed.Appx. 936, 939 (11th

Cir. 2005).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions set forth above, "the cases in which habeas petitioners can properly prevail ... are few and far between." Chandler, 218 F.3d at 1313. This is because the test is not what the best lawyers would have done or even what most good lawyers would have done, but rather whether some reasonable lawyer could have acted in the circumstances as defense counsel acted. Dingle, 480 F.3d at 1099; Williamson v. Moore, 221 F.3d 1177, 1180 (11th Cir. 2000). "Even if counsel's decision appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'" Dingle, 480 F.3d at 1099 (quoting Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983)). The Sixth Circuit has framed the question as not whether counsel was inadequate, but rather counsel's performance was so manifestly ineffective that "defeat was snatched from the hands of probable victory." United States v. Morrow, 977 F.2d 222, 229 (6th Cir. 1992).

As will be demonstrated in more detail below, the movant is not entitled to vacatur on the claims presented. When viewing the evidence in this case in its entirety, the alleged errors raised in this collateral proceeding, neither individually nor cumulatively, infused the proceedings with unfairness as to deny the movant a fundamentally fair trial and due process of law. The movant therefore is not entitled to habeas corpus relief. See Fuller v. Roe, 182 F.3d 699, 704 (9th Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation), overruled on other grounds, Slack v.

8

McDaniel, 529 U.S. 473, 482 (2000). See also United States v. Rivera, 900 F.2d 1462, 1470 (10ᵗʰ Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to the movant's apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).

## VI. Facts Adduced at Trial

Given the nature of claims raised herein, a general recitation of the facts adduced at trial, and as set forth by the Eleventh Circuit Court of Appeals in its written decision affirming movant's conviction, is stated below.

Khan was born approximately eighty years ago in the Swat Valley, a region of northern Pakistan located near the Afghanistan-Pakistan border. Since 1967, Khan has owned a madrassa in his native village. For more than four decades, his madrassa has taught local children about the Quran and other religious topics. Over time, Khan's madrassa grew. It eventually expanded into a boarding school that attracted children from surrounding villages. Most of Khan's students were poor: none paid the cost of tuition, room, or board. To finance the school's day-today operations, Khan relied on donations from relatives and others interested in helping the madrassa flourish. This was his life's work. So central is his role as a spiritual leader that it is even reflected in his first name—"Hafiz" is a title he earned for having memorized the Quran in its entirety.

But after six decades in Pakistan, Khan decided to leave. He came to the United States in 1994 and took up residence in Miami, Florida. He was naturalized as an American citizen in 2000. Prior to his arrest in 2011, Khan was an imam at a local mosque.

Khan's absence from Pakistan did not signal his madrassa's end. Save for a period of time in 2009 when the Pakistani government temporarily shut the school down

9

for its alleged connections to the Taliban, the madrassa still maintained operations in the Swat Valley. And Khan remained actively involved. For example, he carried on a legal dispute in Pakistan over a parcel of land he sought to acquire in the hopes of building an addition to the madrassa.

He sent money, too. Using local financial institutions, Khan wired money to personal bank accounts he kept at the National Bank of Pakistan. He then instructed friends and relatives in Pakistan who had access to these accounts to distribute the money on his behalf. Sometimes, the remittances would go toward financing the madrassa. For instance, Khan wired money to pay the salaries owed to the madrassa's teachers, make repairs to the building, and buy oil to run the school's generator. Other times, the money went to injured or incarcerated Taliban fighters. Indeed, evidence admitted against Khan at trial revealed that Khan leveraged his relationship with the madrassa to support the Pakistani Taliban.

While Khan shuffled funds among accounts at home and abroad, the Government watched—and listened. The Government's investigation began in late 2007. It produced three types of evidence. First, pursuant to the Foreign Intelligence Surveillance Act ("FISA"), 50 U.S.C. §§ 1801 *et seq.*, the Government intercepted approximately 35,000 telephone calls between Khan and his friends and relatives in Pakistan. Second, the Government employed an informant, who—posing as a wealthy Taliban sympathizer—ingratiated himself with Khan by helping Khan run errands and attend medical appointments, all while surreptitiously recording their conversations. Third, the Government subpoenaed financial records from the banking institutions Khan used to transfer his money from the United States to Pakistan.

In May 2011, Khan was indicted along with five codefendants: two of his sons, Irfan Khan and Izhar Khan; his daughter, Amina Khan; his grandson, Alam Zeb; and his business associate, Ali Rehman. Ali Rehman, Alam Zeb, and Amina Khan—all of whom live in Pakistan—remain untried. Efforts to extradite them to the United States failed. The Government dismissed charges against Irfan Khan prior to trial, and the District Court acquitted Izhar Khan following the Government's case-in-chief. Hafiz Khan's case, however, proceeded.

10

(Cr-DE#880; See also United States v. Khan, 794 F.3d 1288, 1292-1294 (11th Cir. 2015).

## VII.  Discussion

In **claim 1,** movant argues that he received ineffective assistance of counsel, where his lawyer failed to present material witnesses because he did not obtain the official permission of the Pakistani Government to conduct the witnesses' depositions.  (Cv-DE#17:4).

At an early pretrial hearing, the government argued that the defense needed to provide a request for foreign depositions if it intended on taking them because of the "fairly intense litigation" that may arise. (Cr-DE#825:14). At the same hearing, counsel requested costs for an attorney and investigator in Pakistan who would be able interview potential witnesses in order to determine if depositions were necessary. (Id.:18).

In June 2012, counsel filed a motion for depositions, pursuant to Fed.R.Cr.P Rule 15, to depose Noor Mohammad, Ali Rehman, Amina Khan, and Alam Zeb. (Cr-DE#364). Rehman, Khan and Zeb were movant's co-defendants, who were not able to be extradited to the United States to face trial. (Cr-DE#3). Later on, counsel requested to depose Abdul Qayyum as well. (Cr-DE#366). In his Rule 15 motions, counsel argued that the depositions should be granted due to the extraordinary circumstances of the case, including: (1) The witnesses all resided in Pakistan and were not subject to the subpoena power of the court; (2) the testimony was material because they would testify to the nature of the phone calls which the government intended to admit into evidence; and (3) the testimony of the witnesses was necessary to prevent a failure of justice.

(Cr-DE#s364,366).[7]

The government strongly opposed the motion, arguing that significant issues could arise from the taking of foreign depositions. (Cr-DE#390). According to the government, depositions in a foreign country would require formal approval, and as such, the government provided the defense a link to the State Department's website regarding how to obtain evidence from Pakistan and the use of Letters Rogatory. (Id.:15,n.6;Cr-DE#543:10). Moreover, the prosecutor informed the court and defense that the United Arab Emirates, a possible third party country to host the depositions, notified him that any request to host the depositions would be denied because one of the proposed witnesses, Noor Muhammad, was alleged to be a Taliban fighter. (Cr-DE#550:45-47).

Thus, the defense maintained, that the only possible place where the depositions could take place was Pakistan. (Id.:45). Moreover, the defense argued that it had already contacted Pakistani officials, and was informed, contrary to the government's assertion, that Letters Rogatory were not needed. (Cr-DE#828:5). Ultimately, the court granted the motion, permitting the Rule 15 depositions to proceed under several conditions, including in pertinent part, the requirement that defense counsel submit evidence showing that the government of Pakistan (1) explicitly permitted the depositions or, (2) acknowledged that it was aware of the depositions and no formal permission was needed. (Cr-DE#562:8).

---

[7] Later, counsel also filed a motion to convert six Rule 17(b) witnesses (Sardar Ali, Muhammad Yossaf Khan, Muhammad Sher Ali Khan, Abdul Baseer, Anayat Ullah, and Mohammad Ramzan) into Rule 15 witnesses because of the difficulty in having them transported from Pakistan to the United States. (Cr-DE#708). As a last resort, counsel argued that the witnesses should be able to testify via videoconferencing under Rule 15. (Id.). The request was granted by the court. (Cr-DE#715).

In response to the court's requirements, counsel provided the court with an affidavit from Atif Ali Khan, an attorney working on movant's case in Pakistan, in which he declared that he met with Pakistani officials who informed him that because the Government of Pakistan was not a party to the case, no permission for the depositions was obtainable. (Cr-DE#598:1). However, the affidavit further stated generally that United States officials participating in depositions in Pakistan must first obtain permission from the Pakistani government. (Id.).

At a hearing just before trial, the affidavit was thoroughly discussed. (Cr-DE#620:77). The government argued that the affidavit was not in compliance with the court's order granting the depositions because it did not explicitly state that the Pakistani government permitted the depositions. (Id.:78). The government further stated that it had attempted to make contact with the Pakistani government, and was informed that it could only be done through formal channels. (Id.:80-81). The court expressed concern with the affidavit, stating that it could be interpreted to mean that official Pakistani permission was needed because United States officials would be participating via video conference. (Id.:82). Counsel explicitly stated that he personally met with the deputy solicitor at the Ministry of Law who informed him that if the government of Pakistan was not a party to the action, that they would not put anything down in writing stating that official permission was not necessary. (Id.:84).[8] Counsel further insisted that there would be no problem with the video depositions, and that he had done a test run on his visit. (Id.:85). He stated that there was nothing more that could be done from the defense perspective,

---

[8]Counsel also spoke with Pakistan's legal counsel for Foreign Affairs, who informed him that he would refer the issue to the Ministry of Law, who counsel had already spoken with. (Cr-DE#620:89).

because counsel had made it clear to the Pakistani officials that
he did not represent the United States, and as such, no permission
was needed. (Id.:90). Ultimately, the court allowed the depositions
to remain scheduled, but also asked the government to reach out to
the Pakistani government and inform them of the depositions.[9]
(Id.:100). The State Department subsequently sent a diplomatic note
notifying the Pakistani government of the depositions, and that
prosecutors would participate via video conference. (Cr-
DE#834:192).

During trial, the first of the witnesses to testify was Ali
Rehman, one of movant's co-defendants. (Cr-DE#847:13). Rehman, who
lived in the Swat Valley of Pakistan, testified that he was against
the Taliban. (Cr-DE#947:27). He testified that he knew the movant,
and although he had never met him in person, had spoken to him on
the phone. (Id.:31). His friend, Anayat Ullah, asked Rehman to pick
up money sent by movant, Ullah's father-in-law in the United
States, and deliver it to him. (Id.:33). That money, Rehman
claimed, was not given to the Taliban. (Id.:63). He further stated
that he only spoke on the phone with movant about the Taliban with
regard to the situation in his village, and stated that the movant
would ask him to give money to those in need. (Id.:63,75). He
denied ever being asked by movant to purchase guns for the Taliban.
(Id.:81). On cross-examination, Rehman was thoroughly questioned
by the government regarding incriminating recorded phone calls in
which movant referred to Rehman as the individual who takes money
from his account to buy guns. (Cr-DE#848:18).

Next, Noor Muhammad, also from the Swat Valley in Pakistan,
testified that he had never fought for the Taliban. (Id.:42,45).

---

[9] Ultimately, the court ruled that all foreign testimony would be live via
video-feed during trial. (Cr-DE#845:164).

Then abruptly, the live video signal was lost. (Id.:45-46). Counsel argued that the internet was cut when Pakistani intelligence operatives came to the hotel. (Id.:55). He claimed that officials cut the video feed after the prosecutor revealed the location of the depositions during her cross-examination of Mr. Rehman. (Id.). The court, in turn, stated that it had intended to avoid such a problem in the first place by requiring that counsel obtain explicit permission from Pakistan regarding the depositions, which was never done. (Id.:56).

After he was given an opportunity to investigate, counsel filed a motion for the court to consider moving the depositions to a third party country. (Cr-DE#849:7). Unable to secure visas, the defense moved for a mistrial, which was denied by the trial court. (Cr-DE#850).

"Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978). Indeed, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision and it is one that [the courts] will seldom, if ever, second guess." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995).

Moreover, as a general matter, trial counsel is not ineffective in failing to call witnesses whose testimony would largely be cumulative of evidence the jury did hear. See Matthews v. Workman, 577 F.3d 1175, 1192-93 (10th Cir. 2009); see also Walker v. Secretary, Florida Dept. of Corrections, 495 Fed.Appx. 13 (11th Cir. 2012)(counsel not ineffective in failing to call alibi witness where testimony would have been cumulative and jury could have

15

viewed the testimony as incredible); Johnston v. Singletary 162
F.3d 630, 639 (11th Cir. 1998)(counsel was not ineffective for
failing to present additional witnesses whose testimony would have
been cumulative).

"[E]vidence about the testimony of a putative witness must
generally be presented in the form of actual testimony by the
witness or on affidavit. A defendant cannot simply state that the
testimony would have been favorable; self-serving speculation will
not sustain an ineffective assistance claim." United States v.
Ashimi, 932 F.2d 643, 650 (7th Cir. 1991) (footnotes omitted). In
other words, to successfully assert that trial counsel should have
called a witness, a petitioner must first make a sufficient factual
showing substantiating the proposed witness testimony. United
States v. Schaflander, 743 F.2d 714, 721 (9th Cir. 1984)

Here, in support of his claim about the witnesses' purported
testimony, movant provides sworn declarations of witnesses Amina
Khan, Alam Zeb, Noor Mohammad, and Abdul Qayyum, all of whom were
unable to testify via video when the internet was cut during trial.
(Cv-DE#18). Essentially, in all of these sworn declarations, the
witnesses state that they have never supported the Taliban, and
that the movant has never sent any money to Pakistan for purposes
of supporting the Taliban, and that any money he sent was to help
his family and the community (Id.:3,11-12,21-23,31).

Thus, it is clear that this proffered testimony, which counsel
failed to present, would have been beneficial to movant's case, as
it would have served to distance him from the government's evidence
supporting their claim that he was a Taliban supporter. However,
counsel did intend to present these witnesses, and filed a motion
for Rule 15 depositions in order to secure their testimony.

16

Unfortunately, for the movant, as previously discussed, the testimony was cut short and counsel was unable to present the witnesses, with the exception of Ali Rehman.

Here, counsel's performance cannot be deemed deficient simply because he failed to comply with the court's order. Rather, movant must show that counsel's performance was so patently unreasonable that no competent attorney would have chosen it. <u>Adams v. Wainwright</u>, 709 F.2d 1443, 1145 (11th Cir. 1983). As previously discussed, counsel made significant efforts to secure the testimony of these defense witnesses. In fact, he was able to convince the court to allow the depositions to take place in Pakistan, because the witnesses were unable to travel to the United States. At a pretrial hearing, counsel explicitly stated that he personally met with the deputy solicitor at the Ministry of Law who informed him that if the government of Pakistan was not a party to the action, that they would not put anything down in writing saying that official permission was not necessary. (Cr-DE#620:84). He further stated that there was nothing more that could be done from the defense perspective because counsel had made it clear to the Pakistani officials that he did not represent the United States, and as such, no permission was needed. (Id.:90). Even the Eleventh Circuit stated, *in dicta*, that it did not "doubt that defense counsel acted in good faith in attempting to secure [the] testimony despite some very challenging circumstances. <u>Khan</u> 794 F.3d at 1312 (2015).

Moreover, it is entirely possible that had counsel requested official permission from Pakistan, and gone through the formal channels as argued by the movant, that such a request would have been denied. At a pretrial hearing regarding the Rule 15 depositions, John Bangert, an FBI special agent stationed at the

U.S. Embassy in Islamabad, testified to the following:

> PROSECUTOR:   Okay. You've told us earlier that some sort of approval would be necessary from the Pakistani Government in order to conduct this business by U.S. Government officials on Pakistani soil; is that correct?
>
> BANGERT:   That's affirmative.
>
> PROSECUTOR:   All right. And have you discussed with colleagues and formed an opinion on whether such approval would be granted by Pakistani authorities?
>
> BANGERT:   To my knowledge we have never been granted direct access to a Pakistani national that is under indictment or wanted by the United States.
>
> PROSECUTOR:   And that's based on other cases, other investigations that are going on?
>
> BANGERT:   Affirmative.

(Cr-DE#550:82-83). Although this was in the context of U.S. officials seeking to obtain access to Pakistani nationals under indictment, three of the witnesses whom counsel intended to depose were, in fact, movant's co-defendants in the indictment. The challenging nature of the relationship between the United States and Pakistan was thus, "not an easy area to navigate in," and it was possible that if the Pakistani government expressly denied the request for depositions, that the opportunity to present the witnesses' testimony would have been foreclosed. (Cr-DE#620:95-96).

Given the realities of the situation, counsel may have made a strategic decision to not request official permission because there was a likelihood that such permission would have been denied. It is

well-settled that reasonable strategic choices by counsel regarding the various plausible options in a given case are "virtually unchallengeable." Strickland, 466 U.S. at 690. Even if in retrospect the strategy to pursue one line of defense over another appears to have been wrong, the decision will be held ineffective only if it was so patently unreasonable that no competent attorney would have chosen it. Adams v. Wainwright, 709 F.2d 1443, 1145 (11th Cir. 1983). Accordingly, tactical or strategic choices by counsel cannot support a collateral claim of ineffective assistance. See Chandler v. United States, 218 F.3d 1305, 1314 (11th Cir. 2000)(en banc), cert. denied, 531 U.S. 1204 (2001)(holding that counsel cannot be deemed incompetent for performing in a particular way in a case as long as the approach taken "might be considered sound trial strategy")(quoting Darden v. Wainwright, 477 U.S. 168 (1986)); United States v. Costa, 691 F.2d 1358 (11th Cir. 1982).

Here, counsel made significant efforts to ensure that the witnesses' testimony could be presented without issue. His strategic decision to forego requesting explicit permission was consistent with the information had been given to him in his talks with Pakistani officials. Thus, given the challenging nature of movant's case, it cannot be said that counsel's performance was deficient. Strickland, 466 U.S. at 687-88.

However, even when assuming that counsel's performance was deficient, movant fails to demonstrate that he was prejudiced by counsel's allegedly deficient performance. He provides no support to suggest that had counsel formally requested approval through the proper channels, that such a request would have been granted. In fact, counsel specifically stated that he spoke with Pakistani officials who informed him that if the government of Pakistan was not a party to the action, that they would not put anything down in

writing saying that official permission was not necessary. (Cr-
DE#620:84). There is plainly no indication, from the record or
otherwise, that counsel would have been able to obtain the explicit
permission had it been requested.

Movant further fails to provide this court with any affidavits
from the government of Pakistan stating (1) what proper procedures
should have been followed, and (2) if the proper procedures had
been followed, that his request for foreign depositions would have
been granted. It is simply not sufficient for him to claim that he
was prejudiced, without providing this court with any facts to
suggest that had counsel complied with the court order, that his
request would have been granted and the depositions would have
proceeded as planned. Such a conclusory allegation of ineffective
assistance of counsel is insufficient. Smith v. White, 815 F.2d
1401, 1406-07 (11th Cir.1987)(A §2255 movant must provide factual
support for his contentions regarding counsel's performance. See
Also Boyd v. Comm'r, Ala. Dep't of Corr's, 697 F.3d 1320, 1333-34
(11th Cir. 2012)(Bare, conclusory allegations of ineffective
assistance are insufficient to satisfy the Strickland test).

Movant's claim that he need not show that the government of
Pakistan would have approved the depositions is incorrect. (Cv-
DE#26:8). He must show that had counsel taken reasonable steps to
procure the testimony, that it actually would have been able to
have been presented, and as such, there is a reasonable likelihood
that the outcome at trial would have been different. He makes no
such showing here. Thus, movant's claim that he received
ineffective assistance of counsel  due to counsel's failure to
obtain official permission from Pakistan is without merit.

Moreover, it should be noted that movant further fails to

20

provide any support for his claim that the testimony of these witnesses would have resulted in a reasonable likelihood of a different outcome at trial. He claims that because the testimony was "highly material" to his defense, that he has demonstrated prejudice. (Cv-DE#26:4). However, just because this testimony was highly material to his defense, does not necessarily mean that there was a reasonable likelihood that had the testimony been presented, that it would have resulted in a different outcome at trial.

Rather, review of the record reveals that movant was as supporter of the Taliban, stating that it was the "right fix" for Pakistan. (Cr-DE#835:78). In a recorded phone call, movant wished for the destruction of the Pakistani Army by way of a revolution like the one done by Ayatollah Khomeini in Iran. (Cr-DE#84):128). He also wished for an attack similar to the one done by the Taliban at the Marriott Hotel in Islamabad in 2008. (Cr-DE#841:22-30).

After Abdul Jamil, a Pakistani Taliban member and movant's nephew, was injured by fighting against the Pakistani Army, movant discussed getting money to him through Amina Kahn, his daughter. (Cr-DE#834:46-53). On July 16, 2009, movant sent $900 through his son, Izhar, to Amina Khan in Pakistan so that she could give the money to Jamil. (Id.:74-82). There was also evidence presented to show that movant sent money to Noor Muhammad, an injured Taliban fighter in November 2009. (Id.:122-123).

On another occasion, during a recorded conversation between movant and his grandson, Alam Zeb, he stated that he had signed a check made out to Zeb in order to give part of it to Noor Muhammad via Abdul Qayyum, one of movant's associates. (Cr-DE#834:135-137,152). In a conversation with a confidential source, movant

helped arrange for the confidential source to travel to Pakistan to give Muhammad funds. (Id.:142-150). These are only a few of the numerous recorded phone calls that the government presented at trial which showed that movant actively supported the Pakistani Taliban.

Furthermore, at sentencing, the court stated that there was overwhelming evidence to show movant's guilt. Citing this overwhelming evidence, the court stated as follows:

> The evidence clearly showed that [Khan] sent money intending it to go to the Taliban, to be used to violently overthrow the Pakistani government, to kill police officers, to kill members of the Army, to blowup the National Assembly which is the equivalent of our Congress. The only time he complained about the Taliban was the fact that they were near his home village, which caused the Army to come in an fight against them near his home village and cause mayhem in that area and he wanted them to go to Islamabad where the Assembly was and that's where they should be taking their action and have the big bomb, okay, and destroy the Assembly...

(Cr-DE#861:7-8). The Eleventh Circuit, too, in its decision affirming movant's conviction, stated that the phone recordings were "powerful evidence of [movant's] guilt." Khan, 794 F.3d at 1294.

It should also be noted that two of the witnesses who were unable to testify, Amina Khan and Alam Zeb, were movant's co-defendants, who had been unable to be extradited to the United States. The credibility of their proffered testimony would have clearly been at issue had they testified, given their obvious motives to protect both themselves and the movant from prosecution and possible imprisonment.

22

Moreover, review of the record reveals that defense counsel was able to elicit much of the proffered testimony through other witnesses. As previously discussed, according to movant, the proffered testimony would have generally served to rebut the allegation that movant was a Taliban member. (Cr-DE#17:14). However, counsel was able to present other defense witnesses to show this evidence. Shah Zeb, Amina Khan's husband and Alam Zeb's father, testified that his wife was not a Taliban supporter, a fact which would have been covered by Amina Khan's proffered testimony. (Cr-DE#843:102,126). Moreover, Kalsoom Kahn, testified that Abdul Jamil, movant's nephew, was not a Taliban fighter, and denied that Jamil had anything to do with the Taliban. (Cr-DE844:65-107). This information too, would have been covered by Amina Kahn's proffered testimony.

Thus, the record is clear that much of the proffered testimony that could not be presented when the video signal was lost, was presented to the jury through other witnesses and evidence. Even in light of this, the jury still evaluated the credibility of the witnesses, disbelieved movant's theory of defense, and decided to find movant guilty based on the overwhelming evidence presented by the government at trial.

Finally, movant's allegation that counsel was ineffective because he "promised" the jury that these exculpatory witnesses would testify is without merit. The jury was specifically instructed that what the parties stated in opening statements was not evidence, and that they were not to consider it as such. (Cr-DE#833:14-15). Moreover, the case law that movant relies upon for his argument that this "unfulfilled promise" to the jury was ineffective on counsel's part is not law from within this circuit.

(Cr-DE#17:17,fn.48). Rather, in <u>Howard v. Davis</u>, the Eleventh Circuit held that counsel's perspective during opening statement is a relevant factor when evaluating counsel's ineffectiveness. 815 F.2d 1429, 1433 (11th Cir. 1987). In <u>Howard</u>, the Eleventh Circuit found that counsel's decision to announce an insanity defense in opening, and then abandon it later on, may have been "unusual" but was not ineffective given his rationale. <u>Id</u>. At 1433. Moreover, the court, in relying on <u>Strickland</u>, stated that it must "eliminate the distorting effects of hindsight" when evaluating such a claim. <u>Id</u>. At 1433 (internal quotations ommitted). Thus, it was not unreasonable for counsel, at the time of opening statement, to argue that testimony would be presented to discredit the government's allegations, as he could not have foreseen that the testimony would have been cut short. Furthermore, as previously discussed, counsel was able to present witnesses to the jury who testified on behalf of movant. Importantly, counsel did not explicitly state in opening which witnesses he would be calling to testify, only stating that he was going to bring "someone" to tell the jury what the movant's funds went to. (Cr-DE#833:61).

Thus, for the reasons previously discussed, movant cannot establish prejudice because he fails to establish any facts to suggest that counsel's failure to present the witnesses' testimony was directly due to his failure to get explicit permission from the Pakistani government. This is so because movant puts forth no facts to suggest explicit permission would have been granted had it been requested by counsel in the first place. Thus, movant's claim 1 should be denied as it warrants no habeas corpus relief.

In **claim 2**, movant argues that he was denied effective assistance of counsel where his lawyer failed to prepare him to testify. (Cv-DE#17:4). The respondent argues that movant's claim,

that he was unprepared and too impaired by his dementia to testify, is contradicted by his testimony at trial. (Cr-DE#25:13).

Review of the record reveals that after attempts to re-establish the video feed failed, the defense's request for a mistrial was denied. (Cr-DE#850:5). Defense attorney Vizcaino then requested that the court wait for counsel, Khurrum Wahid, to return from Pakistan before movant took the stand because movant was more familiar with him. (Id.:9). After the request was denied, movant took the stand. (Id.:13).

Movant testified that he was born in the Swat Valley in Pakistan. (Id.:13-14). He testified about his qualifications as an Imam, and how he started a madrassa, a school, where local children would attend. (Id.:17-18). He also stated that he did not charge tuition to his students, who were very poor. (Id.:20).

He vehemently denied supporting the Taliban. (Id.:30-31). He also attempted to explain some of his statements in the phone recordings. (Id.:42-43). In one instance, he testified that when he stated that "god should turn the [Pakistani] government upside down, and that it "would be really good if America takes over the whole of Pakistan," he was trying to say that in Pakistan there is no law, but in America, there is law and people obey the law. (Id.). He also attempted to explain away one phone call by stating that he was "angry" when he made certain statements about the Pakistani government. (Id.:46-47). He denied that he had ever owned a gun or made a bomb, and that when he sent money to various people, he did it to help those in need. (Id.:60-69). Throughout his thorough testimony on direct examination, movant was able to answer the questions logically and rationally, and provided information that was beneficial to his defense. (Id.:69-151; Cr-

DE#851:7-80).

However, on cross-examination, movant became agitated, and refused to answer some of the prosecutor's questions. (Cr-DE#851:80-141;Cr-DE#852:1-100). At one point, he even suggested that the prosecutor had a "mental problem" and should go to the hospital. (Cr-DE#851:105). Throughout his strained cross-examination, movant insulted the prosecutor, questioning whether or not he was even an attorney. (Id.:103, 108).

It is well settled that a criminal defendant has a fundamental constitutional right to testify in his or her own behalf at trial. Rock v. Arkansas, 483 U.S. 44, 49-52 (1987); United States v. Teague, 953 F.2d 1525, 1532 (11 Cir. 1992) (en banc). This right is personal to the defendant, and cannot be waived by the trial court or defense counsel. Teague, supra; Brown v. Artuz, 124 F.3d 73, 77-78 (2nd Cir. 1997). The proper vehicle for an argument that a defendant's right to testify was violated by her trial counsel is a claim of ineffective assistance of counsel, which requires analysis under Strickland v. Washington, 466 U.S. 668 (1984). Gallego v. United States,174 F.3d 1196

Here, movant made the choice to testify, which was his and his alone. His allegation that he was unprepared and confused due to his dementia diagnosis is insufficiently pled. See Also Boyd v. Comm'r, Ala. Dep't of Corr's, 697 F.3d 1320, 1333-34 (11th Cir. 2012). He provides no facts to demonstrate how counsel could have prepared him to testify in such a way that would not have resulted in the same outcome. He further fails to demonstrate how his angry and combative responses to the prosecutor's questions were due to any deficiency on the part of counsel. Moreover, his allegation that his dementia diagnosis impaired his ability to testify on his

own behalf if wholly belied by the record. As previously discussed, he was able to thoroughly and appropriately answer counsel's questions on direct examination, even providing testimony that was beneficial to his case.

Furthermore, while it may have been a "last minute decision" to put movant on the stand, counsel had to adapt to the circumstances ongoing in the trial. As previously discussed, counsel had intended to present numerous defense witnesses but was unable to because the video signal was cut, thereby damaging his theory of defense. Although he was able to present some witnesses, he needed another way to bring out further testimonial evidence to show that movant was not engaged in supporting the Taliban, and that the government's representations about the substance of the phone recordings were misleading. As such, movant decided to testify. However, as previously discussed, there is no indication that movant was unprepared to testify, or that his combative and belligerent answers on cross-examination could have been prevented by way of further witness preparation.

As such, movant fails to demonstrate that he received ineffective assistance of counsel, where his lawyer allegedly failed to prepare him to testify. Thus, movant's claim should be denied on the merits as it warrants no habeas corpus relief.

### VIII.   **Evidentiary Hearing**

Movant's request for an evidentiary hearing must be denied. To determine whether an evidentiary hearing is needed, the question is whether the alleged facts, when taken as true, is not refuted by the record and may entitled movant to relief. Schriro v. Landrigan, 550 U.S. 465, 474, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007)(citation

omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id</u>. The pertinent facts of this case are fully developed in the record before the Court. Because this Court can "adequately assess [Petitioner's] claim[s] without further factual development," <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003), <u>cert. den'd</u>, 541 U.S. 1034 (2004), an evidentiary hearing is not warranted.

## IX.  <u>Certificate of Appealability</u>

A prisoner seeking to appeal a district court's final order denying his petition for writ of habeas corpus had no absolute entitlement to appeal, but must obtain a certificate of appealability ("COA"). <u>See</u> 28 U.S.C. §2253 (c)(1); <u>Harbison v. Bell</u>, 556 U.S. 180, 129 S. Ct. 1481 (2009). This Court should issue a certificate of appealability only if the movant makes "a substantial showing of the denial of a constitutional right." <u>See</u> 28 U.S.C. §2253 (c)(2). Where a district court has rejected a movant's constitutional claims on the merits, the movant must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. <u>See</u> <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the movant must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Id</u>. Upon consideration of the record as a whole, this Court should deny a certificate of appealability. Notwithstanding, if movant does not agree, he may bring this argument to the attention of the district judge in objections.

28

## X.   <u>Conclusion</u>

For all of the foregoing reasons, is therefore recommended that this motion be DENIED on the merits; that final judgment be entered; that no certificate of appealability issue; and, that the case be closed.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

SIGNED this 23rd day of April, 2018.

_____
UNITED STATES MAGISTRATE JUDGE

cc:   Charles D. Swift
      Constitutional Law Center for Muslims in America
      833 - E. Arapaho Road
      Suite 102
      Richardson, TX 75081
      972-914-2511
      Email: cswift@clcma.org

      Linda Gail Moreno
      Linda Moreno P.A.
      2705 S. Manhattan Ave.
      Tampa, FL 33629
      813.247.4500
      Email: lindamoreno.esquire@gmail.com

      Anne Ruth Schultz
      United States Attorney's Office
      99 NE 4 Street
      Miami, FL 33132
      305-961-9117
      Fax: 530-7941

Email: anne.schultz@usdoj.gov